| | | |
|---|---|---|
| DIAMOND OFFSHORE SERVICES | § | |
| COMPANY & DIAMOND OFFSHORE | § | |
| (USA) L.L.C. | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 7:10-168 |
| | § | |
| HSBC BANK USA, N.A., HSBC MEXICO | § | |
| S.A. & CONADAT ISAIAS | § | |
| GOMEZ BERMAN | § | |
| Defendants. | § | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Diamond Offshore Services Company (DOSC) and Diamond Offshore (USA) L.L.C (DOUSA) (collectively "Diamond" or Plaintiffs) file this Memorandum in Support of its Motion for Summary Judgment against Defendant Conadat Isaias Gomez Berman (Defendant or Gomez) under Federal Rule of Civil Procedure 56.

### NATURE AND STAGE OF PROCEEDING

Gomez and several co-conspirators stole over a million dollars from Diamond while employed as its Regional Administrator in Mexico. Diamond filed suit for fraud, conspiracy and fraudulent concealment. Discovery is complete, and the deadline for dispositive motions is April 15, 2011. Accordingly, Diamond files for summary judgment on its claims and damages.

### ISSUE PRESENTED AND STANDARD OF REVIEW

Did Gomez conspire to and defraud Diamond of $1,341,900.37, concealing his fraud to prevent Diamond's discovery? Summary judgment is proper when there is no genuine issue of material fact. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### SUMMARY OF THE ARGUMENT

In 2006, while he was Diamond's Regional Administrator in Mexico, Gomez conspired to defraud Diamond of $1,341,900.37. In furtherance of the conspiracy, he requested money from Diamond, representing that it was necessary to fund Diamond's Mexican operations. In reliance on Gomez's representations, Diamond wired money into its accounts in Mexico, which were under Gomez's control. Instead of using the funds as he represented, Gomez falsified invoices and wrote checks on Diamond's accounts, purportedly paying the invoices. He then deposited the checks into his own account. Thus, Gomez defrauded Diamond of $1,341,900.37. Diamond wants its money.

### UNDISPUTED FACTS

1) In 2003, Gomez became Diamond's Regional Administrator in Mexico. <u>Ex. 1</u>, Gomez Aff., Q1. <u>Ex. 2</u>, Tafaro Aff., ¶6.

2) As Diamond's Administrator, Gomez lived and worked in Ciudad del Carmen, Mexico, administering Diamond's shore-based operations for its drilling rigs working in the southern Gulf of Mexico. <u>Ex. 1</u>, Q2; Ex. 2, ¶6.

3) As Diamond's Administrator, Gomez had access to Diamond's bank accounts, accounts payables, checks, vendors and money. <u>Ex. 1</u>, Q3; <u>Ex. 2</u>, ¶6.

4) Each week, Gomez caused a "cash statement" to be emailed to Diamond's main office (in Houston, Texas) requesting money to cover checks written the following week from Diamond's HSBC accounts in Mexico. <u>Ex. 1</u>, Q4; <u>Ex. 3</u>, Morgan Aff., ¶4.

5) Based upon Gomez's or his subordinate's requests, Plaintiffs purchased Mexican Pesos (MP$) and electronically transferred funds from their US accounts to their Mexico HSBC accounts to cover Diamond's operating expenses. <u>Ex. 3</u>, ¶¶4&6; <u>Ex. 1</u>, Q5.

6) The money Plaintiffs transferred to the HSBC bank branch in Campeche, Mexico was intended by Plaintiffs to be used to pay Plaintiffs' expenses related to its operations. <u>Ex. 1</u>, at Q6;

Ex. 3, ¶¶4, 6&7

7)     Gomez represented to Plaintiffs that the money he requested would be used to pay Plaintiffs' expenses related to its operations. Ex. 1, Q7; Ex. 3, ¶4, 5&6.

8)     After the amounts were transferred by Diamond into its accounts in Mexico, Gomez processed fraudulent invoices and wrote checks on Plaintiffs' accounts, allegedly paying the fraudulent invoices. Ex. 1, Q10.

9)     After writing checks based on fraudulent invoices, Gomez contacted Emisael Suarez and traveled to the HSBC bank that Emisael Suarez managed, where Emisael Suarez endorsed the checks and cause them to be deposited in an account created for Isaias Berman, rather than to the payee of the check. Ex. 1, Q11; Ex. 2, 5.

10)     The Isaias Berman account into which the fraudulent checks were deposited is Gomez's account. Ex. 1, Q12; see also Id. Affidavit Signature.

13)     Gomez received all of the funds deposited into Isaias Berman's account. Ex. 1, Q13.

14)     Gomez received all of the money embezzled and/or stolen from Plaintiffs. Ex. 1, Q14.

15)     Gomez solicited funds from Plaintiffs that were withdrawn from their accounts under false pretenses and deposited into his account. Ex. 1, Q15; Ex. 2, ¶5.

16)     Gomez made false representations and omissions to Plaintiffs regarding amounts due to vendors and the actual payee of Plaintiffs' checks. Ex. 1, Q19; Ex. 2, ¶¶4&5; Ex. 3, ¶¶4, 6&7.

20)     Gomez knew that his representations and non-disclosures to Plaintiffs regarding amounts due to vendors and the actual payee of Plaintiffs' checks were false when he made them. Ex. 1, Q20.

21)     Gomez knowingly made false representations and non-disclosures to Plaintiffs regarding amounts due to vendors and the actual payee of Plaintiffs' checks for the purpose of obtaining MP$14,633,342 from Plaintiffs.  Ex. 1, Q21.

22) Based on Gomez's false representations and non-disclosures, Plaintiffs provided funds to the accounts to which Gomez had access. <u>Ex. 1</u>, Q22; <u>Ex. 3</u>, ¶6.

23) Based on Gomez's false representations and non-disclosures, and after Plaintiffs provided funds to the accounts to which he had access, Gomez received Plaintiffs' funds. <u>Ex. 1</u>, Q23.

24) The cash reports that Gomez sent to Diamond were required to be correct representations of Diamond's legitimate expenses for its Mexico operations. Ex. 3, ¶5.

27) Because it received the cash requests, containing misrepresentations regarding the amount of Diamond's expenses, Diamond transferred funds into accounts under Gomez's control, providing funds for expenses that were not legitimate business expenses related to Diamond's Mexican operations. Ex. 3, ¶¶4, 5&7.

28) Diamond relied on Gomez's misrepresentations about its expenses, and based upon its reliance on Gomez's misrepresentations, Diamond purchased Mexican Pesos and transferred funds into its accounts, for expenses that were not legitimate business expenses related to Diamond's Mexican operations. Ex. 3, ¶¶6&7.

29) Gomez, Emisael Suarez, Roosevelt Rivera and others conspired to embezzle and/or steal a portion of the transferred sums from Plaintiffs' bank accounts. <u>Ex. 1</u>, Q8.

30) In furtherance of the conspiracy between Gomez, Emisael Suarez, Roosevelt Rivera and others, Gomez requested money in weekly cash reports to cover the amounts he would embezzle and/or steal from Plaintiffs' accounts. <u>Ex. 1</u>, Q9.

31) By June 2009, Gomez had left his employment with Plaintiffs. <u>Ex.1</u>, Q16; <u>Ex. 2</u>, ¶¶8&9.

32) Gomez defrauded Plaintiffs of MP$14,633,342 in 2006, which is US$1,341,900.37. <u>Ex. 1</u>, Q17; <u>Ex. 2</u>, ¶8&9; <u>Ex. 3</u>, ¶7.

18) Gomez embezzled MP$14,633,342 from Plaintiffs, which is US$1,341,900.37. <u>Ex. 1</u>,

Q18, Ex. 2, ¶¶8&9; Ex. 3, ¶7.

29)     In 2009, Diamond began an investigation regarding an invoicing discrepancy involving two of its vendors. Ex. 2, ¶3.

30)     In the course of her investigation, Diamond's investigator received copies of the front and back of certain checks paid to Bransu, S.A. de C. V (Bransu) and Operadores y Asesores de Cancu (Operadores). Ex. 2, ¶5.

31)     The back of these checks showed that the funds payable to Bransu and Operadores were not deposited into an account for either vendor. Instead, they were deposited into an account for Isaias Berman. Ex. 2, ¶5.

32)     Until 2009, Diamond had not ever received copies of the back of these checks because it was not the normal practice for Diamond to request or receive them. Ex. 2, ¶5.

33)     It was only when a discrepancy arose regarding payments made to Bransu and Operadores did Diamond request copies of the backs of its checks, indicating for the first time that the cause of the discrepancy was Gomez depositing funds into his own account rather than paying the vendors as he represented to Diamond in cash reports and other accounting-related records. Ex. 1, ¶¶7, 10-12&15; Ex. 2, ¶¶3&5; Ex. 3, ¶4.

### ARGUMENTS & AUTHORITIES

### Fraud

Gomez committed fraud and Diamond was injured. As a matter of law, Gomez knowingly made false, material representations with the intention that Diamond would act upon his misrepresentations to its detriment; Diamond acted in reliance on Gomez's misrepresentations, and was injured as a result. *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.* 962 S.W.2d 507, 524 (Tex. 1998). As a matter of law, Diamond changed its position in reliance on Gomez's actions.

*Jim Rutherford Investments, Inc. v. Terramar Beach Cmty. Ass'n*, 25 S.W.3d 845 (Tex. App. –
Houston [14th Dist.] 2000, *pet. denied*).

Gomez asserted the Fifth Amendment in response to all questions regarding Plaintiffs' claims
in this case. A jury may draw an adverse inference against a party who pleads the Fifth Amendment.
*Texas Capital Securities, Inc. v. Sandefer*, 58 S.W.3d 760–779 (Tex.App.-Houston [1st Dist.] 2001,
pet. denied) (*citing Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810,
821, (1976)). Refusal to answer questions by asserting the privilege is relevant evidence from which
the finder of fact in a civil action may draw whatever inference is reasonable under the
circumstances. *Lozano v. Lozano*, 983 S.W.2d 787, 791 (Tex.App.-Houston [14th Dist.] 1998) (*also
citing Baxter,* 425 U.S. at 318, 96 S.Ct. 1551), rev'd on other grounds, 52 S.W.3d 141 (Tex.2001).
Here, there is ample evidence of Gomez's fraud, in addition to his invocation of the Fifth
Amendment. Although the Court is required to draw all reasonable inferences favorable to the
nonmovant, improbable inferences are insufficient to defeat a motion for summary judgment.
*Easton v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).

1. <u>Gomez knowingly made false representations with the intent that Diamond would act on
   his misrepresentations to its detriment.</u>

Gomez knowingly made false material representations when he: 1) caused cash reports
containing misrepresentations regarding Diamond's operational expenses to be sent to Diamond; 2)
created Bransu and Operadores invoices for expenses that Diamond did not incur; 3) wrote checks to
pay the fraudulent invoices; 4) represented to Diamond that the expenses included on the weekly
cash reports were accurate and true, and 5) entered the invoiced and amounts paid into Diamond's
accounting records as legitimate operational expenses and payments. <u>Ex. 1</u>, Qs 4, 7, 10, 11, 15, 19,
20, 21; <u>Ex. 2</u>, ¶4; <u>Ex. 3</u>, 4&7. Gomez intended that Diamond would act on his misrepresentations to
its detriment by 1) relying on the amounts he represented as legitimate operational expenses in his

cash reports; 2) purchasing Mexican currency sufficient to fund the expenses shown in his cash reports, and 3) transferring funds from other accounts into accounts that Gomez controlled, allowing him access to the funds to steal. Ex. 1, Qs 3, 4,5,9,12,13,14,21,23.

2. <u>Diamond acted on Gomez's misrepresentations by changing its position in reliance on Gomez's misrepresentations, and was injured as a result.</u>

Diamond acted on Gomez's misrepresentations when it 1) believed his representations in his weekly cash reports regarding the amounts necessary to cover its expenses for its Mexican operations; 2) purchased Mexican Pesos to fund the expenses represented in Gomez's cash reports, and 3) transferred funds into the accounts over and to which Gomez had control and access. Ex. 3, ¶¶4, 5&6. Diamond was injured as a result of its reliance on Gomez's misrepresentations when it 1) transferred US$1,341,900.37 (MP$14,633,343) into accounts over and to which Gomez had control and access, and 2) Gomez wrote checks on Diamond's accounts for MP $14,633,343 and deposited them into his account, under the name of Isaias Berman. Ex. 1, Qs 5,10,11,12,13; Ex. 2, ¶¶5,7,8,9; Ex. 3, ¶¶3,4,6,7.

Accordingly, as a matter of law, Gomez committed fraud, and Diamond was injured as a result. For the reasons set forth in this motion and the exhibits attached in support, Plaintiffs respectfully request that this Court grant Plaintiffs' motion for summary judgment on Diamond's fraud claim against Gomez.

**Conspiracy and Fraudulent Concealment**

As a matter of law, Gomez and at least two others conspired to defraud Plaintiffs of $1,341,900.37 and concealed the evidence of their fraud, preventing Plaintiffs from discovering it until June 2009. To prevail on its conspiracy theory, Plaintiffs must establish the following elements: (1) a combination of two or more persons; (2) an object to be accomplished (an unlawful purpose or a lawful purpose by unlawful means) (3) a meeting of minds on the object or course of action; (4)

one or more unlawful, overt acts; and (5) damages as the proximate result. *Insurance Co. of N. Am. v. Morris*, 981 S.W.2d 667, 675 (Tex.1998); *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983). Fraud is the unlawful purpose that forms the basis of Plaintiffs' conspiracy claim. *Id.*

Roosevelt Rivera (Rivera) was a subordinate of Gomez at Diamond's office in Mexico. <u>Ex. 3</u>, ¶4. Rivera sent cash reports, copying Gomez, to Diamond's headquarters in Houston, containing misrepresentations of the amount of money necessary to fund Plaintiffs' Mexican operations. <u>Ex. 3</u>, ¶¶4, 5&7. These reports were required to contain truthful and accurate representations of expenses. <u>Ex. 3</u>, ¶5. They did not, and Gomez and Rivera conspired to defraud Diamond of $1,341,900.37 and sent the cash reports containing the misrepresentations as overt acts of their conspiracy. <u>Ex. 1</u>, Qs 4, 8, 9; <u>Ex. 3</u>, ¶¶4, 5&7.

Diamond's bank accounts in Mexico were with HSBC, and as a signatory to the accounts, Gomez had control over each. <u>Ex. 1</u>, Qs, 3, 4; <u>Ex. 2</u>, ¶5; <u>Ex. 3</u>, ¶¶3&4. After sending the cash reports to Diamond's headquarters requesting funds to cover expenses, Gomez and Rivera would cut checks to pay invoices purportedly from vendors Bransu and Operadores. <u>Ex. 1</u>, Qs 4,10; <u>Ex. 2</u>, ¶4; <u>Ex. 3</u>, ¶4; <u>compare</u> signature of Affidavit <u>to</u> signature of checks attached as Exhibit 2 to <u>Ex 2</u>. After signing checks to purportedly pay invoices from Diamond vendors, Gomez would travel to HSBC to meet the Manager of the local branch, Emisael Suarez where Gomez would deposit the checks payable to Diamond's vendors into his personal account, held under the name Isaias Berman. <u>Ex. 1</u>, Qs 10,11,12; <u>Ex. 2</u>, ¶¶5&6; <u>compare</u> signature of Affidavit (acknowledging Gomez as Conadat Isaias Gomez Berman) <u>to</u> signature on front of checks and depositor's name on back as Isaias Berman, attached as Exhibit 2 to <u>Ex 2</u>.

Taken together, the evidence cited above and attached to this motion demonstrate that as a matter of law, (1) Gomez combined with one or more persons; (2) to accomplish fraud, (3) each of

whom acted to accomplish the fraud, demonstrating their meeting of minds on the fraud and the actions necessary to accomplish it, and (4) that together, they performed one or more unlawful, overt acts to accomplish the fraud. Further, as a matter of law, Diamond was injured because it lost MP$14,633, 343 or $1,341,900.37 from its accounts as a result of this scheme. Ex. 1; Ex. 2, Ex. 3.

The fact that the cash reports contained misrepresentations about weekly expenses is conclusive evidence of Gomez's fraudulent concealment. But he did more to cover the evidence of his fraud. He 1) created false invoices making it appear that vendors issued invoices for work performed, obligating Diamond to pay these expenses; 2) issued checks payable to the vendors, drawn on Diamond's accounts, and personally deposited the checks payable into Diamond's vendors into his own account. Without seeing the back of the deposited checks, Diamond would never have discovered his fraud. And it was not Diamond's normal practice to receive copies of the backs of its checks from HSBC. Ex. 1, Qs 4, 10, 11, 12; Ex. 2, ¶¶4&5; Ex. 3, ¶5.

Gomez knew that a wrong occurred—he caused it. As the evidence above shows, he orchestrated the fraud and completed the act by depositing the funds into his personal account. His actions demonstrate at every step that he intended to, and did, conceal from Diamond the facts necessary for it to know that it had a cause of action. *Santanna Nat. Gas Corp. v. Hamon Op. Co.*, 954 S.W.2d 885, 890 (Tex. App.-Austin, 1997, pet. denied). Diamond can establish Gomez's fraudulent concealment by providing proof which raises an issue of fact with respect to that claim. *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 121 (Tex.1996).

Diamond can prove more than the existence of a fact issue. As a matter of law, Gomez and other conspired to defraud Diamond of its money and concealed their fraud to prevent discovery. For all of the reasons contained in its motion, Diamond respectfully requests summary judgment on its conspiracy and fraudulent concealment claims.

## Damages

At common law, actual damages are either direct or consequential. *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007). Texas recognizes two measures of direct damages for common-law fraud: out-of-pocket and benefit-of-the-bargain. *Id.*, *citing Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49–50 (Tex.1998). Out-of-pocket damages, which derive from a restitutionary theory, measure the difference between the value of that which was parted with and the value of that which was received. *Id.*

Diamond seeks restitution. It was parted from its US$1,341,900.37 and received nothing in return. As conclusively established above, based upon Gomez's fraud, Diamond withdrew US$1,341,900.37 from its accounts to pay expenses Gomez represented were necessary to cover the following week's invoices and transferred that amount to accounts under Gomez's control. Ex. 3, ¶¶3, 4, 5, 6&7. The invoices Gomez created for those expenses were false, so no services were rendered to Diamond by its vendors. Likewise, the checks Gomez wrote on Diamond's account were never paid to Diamond's vendors. They went into Gomez's account instead. Ex. 1, Qs 10, 11, 12; Ex. 2, ¶¶4, 5&7.   Accordingly, as a matter of law, Diamond lost US$1,341,900.37 as a result of Gomez's fraud. It wants its money back.

## CONCLUSION

For all the reasons set forth in Plaintiffs' Motion for Summary Judgment, its exhibits and attachments, all of which are incorporated herein by reference, Plaintiffs Diamond Offshore Services Company and Diamond Offshore (USA) L.L.C respectfully request that this Court grant its summary judgment against Defendant Conadat Isaias Gomez Berman.

Respectfully submitted,

/s/   Laura P. Haley
Laura P. Haley
State Bar No. 24012766
Fed. Bar No. 26311
15415 Katy Freeway, Suite 100
Houston, Texas 77094
281-492-5300
281-647-2223 (fax)

ATTORNEY IN CHARGE FOR DEFENDANTS
DIAMOND OFFSHORE SERVICES COMPANY AND
DIAMOND OFFSHORE (USA) L.L.C.

OF COUNSEL:

DOBROWSKI L.L.P.
Anthony D. Weiner
State Bar No. 24043984
Fed. Bar No. 38618
4601 Washington Avenue, Suite 300
Houston, Texas 77002
Tel:   (713) 659-2900
Fax:   (713) 659-2908

<u>CERTIFICATE OF SERVICE</u>

All counsel of record have been provided with a true and complete copy of this motion on this 15th day of April, 2011, as required by the Federal Rules of Civil Procedure.

Michael J. Garza of Michael J. Garza P.C.,
6521 North 10th Street, Suite F,
McAllen, Texas 78504
(956) 994-3100 (telephone)
(956) 994-3174 (fax)

/s/ Laura P. Haley
Laura P. Haley